UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

HONG LIU,                                          :
                            Plaintiff,             :
                                                   :        Case No.:
             -v.-                                  :
                                                   :        **COMPLAINT**
FARADAY&FUTURE INC., SMART KING                    :
LTD., JIAWEI WANG, and CHAOYING                    :
DENG,                                              :
                                                   :
                            Defendants.            :
----------------------------------------------------------x

Plaintiff Hong ("Henry") Liu ("Mr. Liu" or "Plaintiff"), by and through his undersigned

counsel, as and for his Complaint against Faraday&Future Inc. ("Faraday"), Smart King Ltd.

("Smart King"), Jiawei Wang ("Jerry Wang" or "Mr. Wang"), and Chaoying Deng (aka Chaoying

Bossert, "Ms. Deng") (all defendants collectively, "Defendants"), respectfully alleges as follows.

## PRELIMINARY STATEMENT

1.      This action arises from fraudulent statements that lured Mr. Liu, a New York

resident and senior equity partner in the New York office of Mayer Brown LLP, to resign his law

partnership, abandon his New York law practice and client base, and leave New York with his

family, in order to serve as the General Counsel for Faraday, a startup electric car company in

California.   After fraudulently inducing Mr. Liu to leave New York, Defendants wrongfully

terminated his employment after less than one year without any legitimate basis, and brazenly

refused to pay the compensation owed to Mr. Liu under the plain terms of his employment

agreement, including over $6 million in cash as well as equity that Defendants represented to be

worth over $100 million.

2.      As a New York-based partner at Mayer Brown and other global law firms, Mr. Liu

developed one of the most active and successful China and Asia-related practices in the United

States, representing numerous prominent clients in significant transactions.

3.     Defendants knew that Mr. Liu would not leave his extraordinarily successful practice in New York unless they could induce him to believe that Faraday would offer a superior package of cash and equity compensation.   In January 2018, Mr. Yueting Jia ("YT Jia" or "Mr. Jia"), the founder, principal shareholder, and chief executive of Faraday and its parent company Smart King, whose net worth was estimated at $3.8 billion by *Forbes* in 2017, represented to Mr. Liu that Smart King had received $2 billion in a private securities placement that valued Smart King at $4.5 billion.  These representations, which were repeated by Jia's associates including defendants Mr. Wang and Ms. Deng, were false.  The $2 billion investment was not completed. Smart King never received $2 billion.

4.     Mr. Liu did not know that Mr. Jia, Mr. Wang and Ms. Deng were engaged in fraud. Nor did he know that Mr. Jia, Mr. Wang and Ms. Deng had no intention of permitting Mr. Liu to act as a bona fide general counsel, *i.e.*, as a general counsel that ensured compliance with applicable law.  Indeed, as Mr. Liu learned first hand, Faraday is tightly and secretively controlled by Mr. Jia and his clique including Mr. Wang (who is Mr. Jia's nephew) and Ms. Deng.  No outsiders are permitted to have any real decision making authority, regardless of their expertise.

5.     When Mr. Liu proactively took steps to ensure Faraday's compliance with applicable law, including by seeking investigations of workplace harassment complaints and immigration violations, and urging Mr. Jia and his family and inner circle not to engage in any irregular financial dealings, Mr. Jia stripped Mr. Liu of his authority and then terminated him without any legitimate basis.

6.     By this action, Mr. Liu seeks redress for the egregious misconduct of Defendants, including cash and equity compensation owed to him under his employment agreement as well as

other compensatory and punitive damages.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367 because those claims are substantially related to Plaintiff's claims under federal law.  This Court also has subject-matter jurisdiction under 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over Defendants because Plaintiff's claims relate directly to Defendants' conduct in or directed to New York, including Defendants' negotiation of the terms of Mr. Liu's employment while he was a New York resident, making  numerous telephone calls and emails to Mr. Liu in New York, and making payments to Mr. Liu's New York bank account during the term of his employment.  Further, Defendants committed torts outside the State of New York that caused injury to Mr. Liu in New York.  Additionally, certain sales of securities and acts, practices, transactions, and courses of business constituting the securities violations alleged in this Complaint occurred in New York.

9.      Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because the Defendants are subject to personal jurisdiction in this district and because Plaintiff's claims relate directly to Defendants' conduct in or directed to this district.  Further, certain sales of securities and acts, practices, transactions, and courses of business constituting the securities violations alleged in this Complaint occurred within the Southern District of New York.

## PARTIES

10.      Mr. Liu is a resident of the State of New York.

11.      Faraday is a corporation organized under the laws of the State of California with its

principal place of business in Gardena, California.

12.    Smart King is a corporation organized under the laws of the Cayman Islands, with its principal place of business in Gardena, California.

13.    Jiawei Wang is a resident of the State of California.

14.    Chaoying Deng is a resident of the State of California.

## FACTUAL ALLEGATIONS

### Mr. Liu Builds a Law Practice in New York

15.    Mr. Liu is a New York-based attorney with decades of experience in global legal, business and financial industries.  He is one of the most experienced lawyers in New York in handling complex cross border matters involving the People's Republic of China ("PRC").

16.    Mr. Liu holds law degrees from Peking University Law School and Harvard Law School, and an MBA from the University of Oxford.

17.    Since 1991, Mr. Liu has been admitted to practice in New York.

18.    Between 1995 and 2000, Mr. Liu served as General Counsel and Director-General of the China Securities Regulatory Commission ("CSRC"), the national securities regulator in the PRC.  At the CSRC, Mr. Liu played a prominent role in reforming the PRC securities industry, including leading a CSRC team that drafted and enacted the PRC's first securities law in 1998.

19.    Mr. Liu is recognized globally for his significant contributions to the development of securities and financial markets in the PRC.  In 1998 and 1999, *BusinessWeek* twice honored Mr. Liu with its "Stars of Asia" awards.  In 1999, the World Economic Forum in Davos honored Mr. Liu with a "Global Leader for Tomorrow" award.

20.    In the early 2000s, Mr. Liu served as a managing director of investment banking at the New York based Donaldson, Lufkin & Jenrette (DLJ) which was later merged into Credit

Suisse First Boston (CSFB), dividing his time between New York and Hong Kong.

21.     Between 2005 and April 2014, Mr. Liu served in senior positions in the New York offices of global law firms, including as a partner with Nixon Peabody LLP, DLA Piper LLP, and Pillsbury Winthrop Shaw Pittman LLP.

**Mr. Liu Develops a Leading China Practice in New York at Mayer Brown**

22.     Between April 2014 and February 2018, Mr. Liu was an equity partner at Mayer Brown LLP in its New York office.

23.     At Mayer Brown, Mr. Liu developed one of the most active and successful China and Asia-related practices in the United States, representing many of the most prominent PRC financial institutions in significant transactions. Mr. Liu's client base included numerous financial giants in the PRC, as well as leading companies in a wide range of industries in the PRC including transportation, infrastructure, manufacturing, insurance, and private equity.

24.     In 2015, Mr. Liu was named to *The National Law Journal's* list of "Regulatory & Compliance Trailblazers," which recognizes individuals who have "made a difference navigating the ever-changing mandates of regulatory and compliance."

25.     Within Mayer Brown, Mr. Liu's practice was recognized for its high profile clients, large deal sizes, continuing and repeat business, and optimal realization rates. In each year of his tenure at Mayer Brown, Mr. Liu was promoted within the firm's equity partnership, rising to senior partner. In 2017, Mr. Liu's compensation at Mayer Brown was approximately $1.35 million.

26.     On February 12, 2018, just prior to Mr. Liu's departure from Mayer Brown, the firm issued a firm-wide announcement, stating in relevant part:

> Under Henry's leadership, the Firm had developed important new
> relationships with some of the largest financial institutions and
> private equity players in China . . . Henry's wide-ranging experience
> has included banking and finance, M&A, investments and

transactions, and regulatory and disputes. He has extensive experience representing Asia and Greater China-based companies conducting business in the United States and throughout the world, including in such industries as financial institutions and investment entities, real estate and infrastructure, aviation and transportation, energy and resources, and manufacturing and technology. Henry also has advised U.S. and non-U.S. companies doing business in Asia and Greater China, including in areas such as market access, direct investment, public and private funds, capital markets, technology transfers and regulatory matters.

**Defendants Lure Mr. Liu From New York Based Upon False Representations**

27.     Between October 2017 and mid-February 2018, at the pinnacle of his success, Mr. Liu was fraudulently induced to leave his prestigious and lucrative equity partnership at Mayer Brown in New York, and his roster of blue-chip clients, and take up a position with a start-up electric car company in California that was years away from producing any cars.

28.     Faraday had been seeking for years to develop and market a viable electric car, without success.   Smart King, Faraday's holding company, has no material operations.

29.     Defendants knew that hiring Mr. Liu, a globally respected professional with decades of experience, would bolster Faraday's credibility with stakeholders.

30.     At all relevant times, Faraday and Smart King were controlled by Mr. Jia, the founder, principal shareholder and chief executive officer of these entities.   Mr. Jia is presently a non-party due to the automatic stay in his personal bankruptcy case which is currently pending in the United States Bankruptcy Court for the Central District of California.   Mr. Jia exercises total control of Faraday and its affiliates through a close network of family members and lieutenants in his inner circle.

31.     In mid-October 2017, Mr. Yanfeng Wang ("Junmin Wang" or "Michael Wang"), Mr. Jia's confidant and finance handler, approached and invited Mr. Liu to travel from New York to Faraday's offices in California to meet Mr. Jia.   On October 17, 2017, Mr. Liu met Mr. Jia for the

first time, at Faraday's California office.  Mr. Jia invited Mr. Liu to join Faraday as his senior partner.

32.     In the ensuing months, Mr. Jia, Mr. Wang, and Ms. Deng sought to induce Mr. Liu to leave his lucrative New York law practice and join Faraday.   Mr. Wang heads Faraday's capital markets department and holds numerous titles, including president, chief financial officer and sole director of Faraday, and director of Smart King.  Ms. Deng handles Mr. Jia's personal finances and serves as president and director of Smart King and vice president of Faraday.

33.     Defendants knew that Mr. Liu would not leave his extraordinarily successful practice in New York unless they could induce him to believe that Faraday would offer a package of cash and equity compensation that was superior to what Mr. Liu was earning at Mayer Brown, and that Faraday had actually raised sufficient capital to make good on its compensation commitments to Mr. Liu.  Further, given that Defendants sought to lure Mr. Liu with promises of a substantial equity stake, it was imperative for Defendants to provide supposed "evidence" of the value of the equity that Mr. Liu would be granted, particularly given that Faraday was a privately held start-up company with no revenues and had not begun production.

34.     On October 25, 2017, Mr. Wang sent Mr. Liu a purported estimate of the value of the Smart King options (representing 2% of the total equity of Smart King) that would be issued to Mr. Liu if he joined Faraday.  According to the estimate, Mr. Liu's options would be worth approximately $43 million based on a "Series A Value."  This was prior to the Evergrande transaction described below.

35.     Beginning in or around January 2018, knowing how critical it was to induce Mr. Liu to believe in Faraday's financial viability and the value of its equity, Mr. Jia and Mr. Wang represented to Mr. Liu that Evergrande Health Industry Group Ltd. (together with its affiliates,

"Evergrande"), a major conglomerate in the PRC, was investing $2 billion in Smart King in a Series A offering. This private securities transaction was not publicly disclosed at the time, and thus Mr. Liu had no way of verifying the representations made by Mr. Jia and Mr. Wang.

36.     In January 2018, during meetings and teleconferences, Mr. Jia, Mr. Wang, and Ms. Deng represented to Mr. Liu that on November 30, 2017, Evergrande completed its $2 billion Series A investment in Smart King, which valued Smart King at $4.5 billion, and that Smart King had actually received the $2 billion. Mr. Jia, Mr. Wang and Ms. Deng also emphasized that since Smart King was valued at $4.5 billion, each one percent of Smart King's equity was worth $45 million.

37.     On January 10, 2018, and again between January 22 and January 24, 2018, Mr. Liu met Mr. Jia, Mr. Wang and Ms. Deng at Faraday's headquarters premises in California. During multiple meetings on these dates, Mr. Jia, Mr. Wang, and Ms. Deng touted the successful completion of the Series A investment from Evergrande, including Smart King's receipt of Evergrande's $2 billion investment. Ms. Deng emphasized this point to Mr. Liu, repeatedly assuring Mr. Liu that since the Series A offering was completed, money was not an issue.

38.     During these meetings, Mr. Liu repeatedly requested to view the Series A documents and attempted to inquire about the details of the Evergrande transaction. However, Mr. Jia and Mr. Wang refused to provide Mr. Liu with the relevant documentation and details of the Evergrande transaction, citing confidentiality obligations to Evergrande, but assured Mr. Liu that the Series A transaction was handled by reputable international law firms including Sidley Austin LLP and that Mr. Liu could be assured  of the validity and quality of the transaction.

39.     Unbeknownst to Mr. Liu, the representations made by Mr. Jia, Mr. Wang and Ms. Deng were false. The Series A investment was not "completed." As Defendants knew (and

deliberately concealed from Mr. Liu), Smart King never received $2 billion. Indeed, Evergrande invested only $300 million in Smart King on or about November 30, 2017, and would invest only $800 million by mid-2018 before terminating its relationship with Smart King.

40.    Defendants' representation that Smart King received a $2 billion investment was a highly material fact that Mr. Liu relied upon in deciding whether to accept Faraday's employment offer and, critically, in assessing the value of the equity compensation that was offered to him. Mr. Liu reasonably believed that Faraday's prospects for success (and the value of the equity of Smart King, Faraday's parent) were significantly enhanced by Evergrande's $2 billion investment.

41.    As a further inducement to Mr. Liu to leave his lucrative practice at Mayer Brown in New York and join Faraday in California, in January 2018, Mr. Jia promised to pay Mr. Liu a $3 million signing bonus plus annual compensation of $1 million over the first five years of his employment. Mr. Jia also promised that Mr. Liu would be entitled to participate in all benefit programs at Faraday at the same level as all senior executives, including being covered by directors' and officer's insurance.

42.    Starting in October 2017 and again in January 2018, Mr. Wang sent Mr. Liu draft employment agreements and communicated extensively with Mr. Liu in New York by telephone and email.

**The Employment Agreement**

43.    Unaware that Mr. Jia, Mr. Wang and Ms. Deng had fraudulently misrepresented the fact that Smart King had received $2 billion from Evergrande, on or about January 25, 2018, Mr. Liu entered into an employment agreement (the "Employment Agreement," attached as Exhibit A to this Complaint) with Faraday, Smart King, and certain of their affiliates (as defined collectively in the Employment Agreement, "FF").

9

44.    Mr. Liu signed the Employment Agreement in New York.

45.    Mr. Wang and Mr. Teddy Kang, a Human Resources manager at FF, signed the Employment Agreement on behalf of Faraday, Smart King, and certain of their affiliates.

46.    The Employment Agreement provides that Mr. Liu would serve as Global Chief Administrative Officer, Global General Counsel and Global Senior Advisor, as well as serving as a senior board member.  (Ex. A at 1).

47.    Under the terms of the Employment Agreement, FF agreed to guarantee Mr. Liu's employment for five years and pay him a comprehensive package of cash and equity compensation which included the following components.

48.    FF agreed to pay Mr. Liu a $3 million dollar signing bonus, payable in five equal installments of $600,000, with the first installment paid upon signing of the Employment Agreement and the remaining four installments paid on each of the four anniversaries of Mr. Liu's first date of employment.  Further, in the event of an early termination of Mr. Liu during the guaranteed five year term, he would receive all of the unpaid installment payments in a lump sum.

49.    FF further agreed to pay Mr. Liu a minimum annual base salary of $1 million during each of five years of his guaranteed five year term, *i.e.*, a minimum base salary of $5 million over the five year term.  If Mr. Liu was terminated "*for any reason*" during the five year term, he would receive the unpaid portion of the $5 million in base salary in a lump sum.

50.    FF further agreed to grant Mr. Liu 20 million shares of FF, which represented two percent of FF's total equity prior to its Series A round, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.  The Employment Agreement provides in relevant part:

> FF shall grant [Mr. Liu] at a minimum cost required by law and outright, 2% of FF's total equity shares pre Series A dilution in the

10

form of restrictive stocks or equity option as [Mr. Liu] may select based on any of FF's available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as [Mr. Liu] may select [].

(Ex. A at 2).

51.     The Employment Agreement further provides that this two percent equity interest (to the extent not already vested) would "*become immediately and fully vested to [Mr. Liu] upon any early termination by FF of [Mr. Liu's] employment within the guaranteed employment term with FF*." (Ex. A. at 2).

52.     The Employment Agreement contained false and misleading representations of material fact.

53.     First, the agreement represented (consistent with what Mr. Jia, Mr. Wang and Ms. Deng falsely told Mr. Liu in January 2018) that FF "*successfully completed its first closing of Series A financing in December 2017*." This representation was false and misleading because Evergrande's $2 billion investment in Smart King's Series A had not "completed" and, as of the date of the agreement, FF had received only $300 million from Evergrande.

54.     Second, the agreement represented that Mr. Liu would "participate in all benefit plans and programs at the same level with all senior executives . . . including . . . insurances including . . . D&O," and that Mr. Liu "is entitled to indemnification . . . on terms no less than any other executives and employees." These representations were false and misleading because Faraday did not maintain directors' and officers' insurance.

55.     Mr. Liu would not have entered into the Employment Agreement if he had known that it contained false representations.

**The Director Compensation Agreement**

56.     On or about February 2, 2018, as a further inducement to Mr. Liu to leave his New York law practice and join Faraday, Mr. Jia signed and entered into a Director Compensation Agreement (the "Director Agreement," attached hereto as Exhibit B) with Mr. Liu.

57.     In the Director Agreement, Mr. Jia repeated the false representations contained in the Employment Agreement.  Thus, Mr. Jia falsely represented that "*[Smart King] successfully completed its Series A financing in December 2017*."  Ex. B at ¶ 2.  Further, Mr. Jia represented that Mr. Liu would be "fully covered by [Smart King] with executive indemnifications to the extent set forth in [Smart King's] standard form of director indemnification agreement" (*id.* at ¶ 3) without disclosing the fact that Smart King did not maintain directors' and officers' insurance.

58.     In the Director Agreement, Mr. Jia personally agreed to pay Mr. Liu, upon certain trigger events such as an initial public offering or a change of control of Smart King, a cash amount equal to 1% of the value of Smart King shares as calculated prior to its Series A offering.

**Mr. Liu Resigns from His New York Partnership and Begins Work at Faraday**

59.     In early February 2018, Mr. Liu resigned from his partnership at Mayer Brown, putting an end to a highly lucrative income stream from New York.  Mr. Liu's resignation also amounted to a forfeit, under Mayer Brown's benefit plans, of significant retirement benefits.  Mr. Liu's decision to cut off these enormously valuable streams of income and benefits from New York sources, and begin work at Faraday in California, was made in reliance on Defendants' false representations as well as the promises they made in the Employment Agreement.

60.     On February 15, 2018, Mr. Liu began working at Faraday.

61.     In the spring of 2018, Mr. Liu moved into a housing compound close to Faraday's offices in California, which he and his family occupied.

62.     Concurrently with his start date, Mr. Liu was paid the first $600,000 installment of his $3 million signing bonus under the Employment Agreement.  This payment, as well as all other payments that Faraday made to Mr. Liu during his employment, was paid or wired to Mr. Liu's New York bank account.

63.     Between mid-February 2018 and October 2018 (when, as described below, he began to be stripped of his authority), Mr. Liu performed numerous tasks in connection with managing the legal and administrative functions of FF, including building up the legal team, drafting and implementing policies on technology and intellectual property protection and other critical areas, and overseeing a wide range of sensitive regulatory and compliance matters.

**Smart King Grants Options to Mr. Liu Pursuant to the Employment Agreement**

64.     On or about September 21, 2018, Smart King's board of directors adopted resolutions (the "September 2018 Resolutions") approving grants of options to numerous employees pursuant to the Smart King Ltd. Equity Incentive Plan.  Mr. Liu, who was then a member of Smart King's board, voted for the resolutions.

65.     Consistent with the Employment Agreement's requirement that Mr. Liu be granted 20 million shares of FF, the September 2018 Resolutions authorized the grant to Mr. Liu of 20,000,000 options to purchase Smart King stock.

66.     Under the September 2018 Resolutions, Mr. Liu's 20,000,000 options would vest in four tranches, representing 40%, 20%, 20%, and 20% of the total grant, with staggered commencement dates as follows.  The first tranche would vest over four years starting on February 15, 2018, Mr. Liu's employment start date.  The second tranche would commence vesting in year two, the third tranche would commence vesting in year three, and the fourth tranche commencing vesting in year four.

67.     In or about January 2019, Mr. Liu received confirmation that Solium Capital ("Solium"), the third-party manager of Smart King's employee stock option plans, had created an account for Mr. Liu.   Mr. Liu accessed his account information on Solium's website, which confirmed that he had been granted 20 million options under the vesting schedules described above.

68.     Mr. Liu has never received any notification that any of his Smart King options have vested.

**Mr. Liu Learns of Serious Workplace Violations**

69.     Beginning shortly after assuming his duties at Faraday, Mr. Liu observed illegal, discriminatory, and outrageous behavior by Mr. Jia and his clique.   Mr. Liu repeatedly advised Mr. Jia and his associates, through direct and open communications, to cease their misconduct.   Mr. Liu also worked with and directed Faraday's legal department to issue appropriate internal communications, and to draft and adopt policies and procedures designed to ensure compliance with applicable laws.   However, Mr. Jia and his clique largely ignored these efforts.

70.     Thus, for example, on numerous occasions, Mr. Jia brazenly announced his preference for working with younger employees, and that Faraday should selectively hire younger employees because they fit more of a "start-up image" and "an entrepreneurial environment," and that older employees are not desirable.   In response, at Mr. Liu's direction, the legal department worked to strengthen and update human resources policies, including with respect to preventing discrimination in hiring.

71.     In mid-2018, several employees filed internal complaints alleging sexual harassment and a hostile work environment at Faraday, including allegations that employees were pressured to hire attractive women for Mr. Jia.   In response, at Mr. Liu's direction, the legal department took steps to investigate complaints, enforce workplace policies, and conduct

management training.

72.     Mr. Liu was also concerned by reports that Mr. Jia was using Faraday as an immigration farm to obtain U.S. visas for numerous PRC nationals.  In May 2018, the U.S. Citizenship & Immigration Services Division of the Department of Homeland Security conducted an on-site inspection of Faraday's offices in Gardena, Los Angeles.  Mr. Liu reminded Mr. Jia of the importance of complying with U.S. immigration laws.  Further, at Mr. Liu's direction, the legal department took steps to ensure compliance with immigration law and to cooperate with the U.S. authorities.

73.     Mr. Jia and his coterie engaged in a pattern of bullying, threats, and harassment. Thus, for example, Mr. Jia made clear to senior management that if they dared to express any views that conflicted with Mr. Jia's views, he would fire and sue them.  Mr. Jia publicly scolded Faraday co-founder Nick Sampson before Faraday's management team, calling him an idiot.  Mr. Wang also threatened Mr. Sampson and Butch Darrow, Faraday's Vice President of Quality.

74.     On October 18, 2018, Mr. Jia sent an email to Faraday employees announcing mass layoffs.  In his email, Mr. Jia claimed that Faraday was eliminating untalented or undesirable employees.  Significantly, most (if not all) PRC nationals at Faraday who were applying for U.S. work visas were not laid off.  Mr. Liu was not consulted on the content of Mr. Jia's email or on the manner in which the layoff was conducted.

75.     During this time period, Mr. Liu actively instructed the legal department to issue memoranda and other communications urging Mr. Jia and Mr. Wang to comply with applicable laws relating to, among other things, employee layoffs, labor codes, fiduciary duties, immigration, financial controls, and privacy laws (so that Mr. Jia and his clique would not secretly record employee activities).  These memoranda were all disregarded by Mr. Jia and Mr. Wang.

**Mr. Jia Strips Mr. Liu of His Authority**

76.     By late October 2018, a majority of Faraday's management (mostly Western managers) recognized the dangers of Mr. Jia's abusive, self-serving behavior and mismanagement. They reached out to Faraday's principal shareholder, Evergrande, seeking its support in effecting a change of management.  The Company's outside counsel, Sidley Austin, was also part of this effort to save the company.

77.     On October 28, 2018, Mr. Liu politely suggested at a management meeting that Mr. Jia should consider stepping back and having other managers assume his responsibilities in the best interest of the company and all stakeholders.  In response, Mr. Jia became enraged, openly cursed Mr. Liu and threatened him.  Mr. Jia stripped Mr. Liu of his Global General Counsel position on the spot.  Mr. Jia's gang, including Mr. Wang and Ms. Deng, also jumped in to verbally attack and harass Mr. Liu.

78.     In response to this incident, multiple senior non-Chinese executives resigned immediately or shortly thereafter, include co-founder and SVP Nick Sampson; SVP and Head of Product & Engineering Peter Savagian; SVP & Head of Manufacturing Dag Reckhorn; VP and Head of Quality Butch Darrow; VP and Head of Technology Jeff Risher, and many more.

79.     Thereafter, Mr. Liu was sidelined, ignored, and retaliated against, and many of his management portfolios were taken away.

80.     In early November 2018, Mr. Liu requested a board meeting to discuss a number of issues, including Faraday's compliance with applicable law related to employee layoffs.

81.     In late November 2018, Mr. Jia threatened to fire Mr. Liu if Mr. Liu did not capitulate and carry out Mr. Jia's orders, even if such orders violated applicable law or were not in Faraday's best interest.  Mr. Jia's cronies made similar threats.

82.     On January 14, 2019, at Mr. Jia's request, Mr. Liu submitted a work plan for 2019. The work plan set forth what Mr. Liu saw as the priorities for Faraday in 2019 and years ahead, and how he would assist Mr. Jia and Faraday to work productively in such areas as law, intellectual property protection, capital management, and government affairs.  Mr. Liu received no response.

83.     On January 23, 2019, Mr. Liu wrote to Mr. Jia directly, documenting the egregious campaign of retaliation being orchestrated by Mr. Jia and his junta:

> I am concerned that you have stripped me of my job responsibilities due to the various complaints that I have raised regarding the company's failure to comply with various state and federal laws.
>
> As is widely known, at least since October 2018, my management responsibilities have been continuously reduced, removed and replaced by you, and my authority and support in performing my duties have also diminished, all without my advance knowledge or agreement. I have been very concerned about these actions, and I have protested to you many times during our past conversations. I have previously expressed to you my grave concern regarding the company's failure to comply with the laws of the State of California and the United States . . . For example, I have directly expressed my views to you and others at the company on how to best comply with laws regarding many company practices, including but not limited to, your improper authorization of the recording of meetings without required consent; immigration and work permit compliance issues which you have ignored; failing to adequately investigate sexual harassment complaints against management especially your close associates; retaliation against employees who have raised concerns regarding financial issues; and timely compliance with the WARN Act. I sincerely wish that you had not and would not retaliate against me for what I have done in performing my responsibilities and duties. I am committed to continue performing my responsibilities at the company based on contractual and legal obligations, as well as my dedication to work with you and all colleagues to bring our company to a success.

84.     Faraday, at Mr. Jia's behest and paralyzed by Mr. Jia's iron grip, never conducted any investigation of the numerous legal and compliance issues identified by Mr. Liu.

85.     On February 4, 2019, Mr. Jia again verbally attacked Mr. Liu, ridiculing,

humiliating and abusing Mr. Liu with fabrications and insults.

**Faraday Wrongfully Terminates and Harasses Mr. Liu**

86.     On February 11, 2019, Mr. Jia told Mr. Liu that he was being terminated.  Mr. Jia threatened and abused Mr. Liu, while ridiculing Mr. Liu's January 23, 2019 email which documented extensive compliance issues at Faraday.  Mr. Jia told Mr. Liu that he knew he was breaching Mr. Liu's employment contract, but that he did not care.  Mr. Jia, among other threats, said that if Mr. Liu dared to challenge the termination in any way, Mr. Jia and the company would dedicate all of their resources to fighting Mr. Liu.  Mr. Jia crowed that he and the Company had unlimited financial resources.  Mr. Jia then left the room.

87.     Acting at Mr. Jia's direction, Qing ("Bob") Ye, a Faraday Vice President and a personal confidant and another personal finance handler of Mr. Jia, told Mr. Liu that if he dared to take action against the company and Mr. Jia, there would be "consequences" and that Mr. Jia and "we" would publicly and globally destroy Mr. Liu, including on Chinese and international media.

88.     Mr. Ye then immediately and personally escorted Mr. Liu from Faraday's offices, without giving Mr. Liu the opportunity to return to his office to retrieve personal items.

89.     Mr. Jia maliciously timed Mr. Liu's termination to occur just days before the first anniversary of Mr. Liu's employment, when Mr. Liu was due to receive the second $600,000 installment of his $3 million signing bonus under the Employment Agreement.  None of the remaining installments (totaling $2.4 million) were ever paid to Mr. Liu.

90.     But Mr. Jia was not finished.  To add insult to injury, Mr. Jia's clique continued to harass Mr. Liu after ejecting him from Faraday.

91.     On or about February 15, 2018, Mr. Liu's real estate broker in California reported that she was contacted by Ms. Deng.  Ms. Deng was attempting to talk the real estate broker into

permitting Faraday's goons to enter Mr. Liu's California residence without authorization from Mr. Liu.  The real estate broker refused to allow this illegal entry demanded by Ms. Deng.

92.     Mr. Liu also learned from a guard at his gated residential compound in California that suspected Faraday operatives, including Michael Wang, attempted to gain unauthorized access to his residence disguised as "plumbers" on numerous occasions.

93.     The abrupt, gangster-like termination of Mr. Liu severely impacted his health, causing physical injury and emotional distress.

**Defendants' Material Breaches of the Employment Agreement**

94.     After terminating Mr. Liu, Faraday failed to pay him the cash and equity compensation owed to him under the Employment Agreement.

95.     The Employment Agreement requires that in the event of an early termination of Mr. Liu during his guaranteed five year term, he would receive all unpaid installments on his $3 million signing bonus in a lump sum.  Faraday never paid Mr. Liu the unpaid portion of the $3 million signing bonus, which is $2,400,000, as required under the Employment Agreement.

96.     The Employment Agreement further requires Defendants to pay Mr. Liu a minimum base salary of $5 million over the five years of his employment, and that if Mr. Liu was terminated "for any reason" during that five year period he must be paid any unpaid portion of the $5 million in a lump sum.  Faraday never paid the unpaid portion of the $5 million in base salary, which totals approximately $4 million.

97.     Further, under the Employment Agreement, Mr. Liu is entitled to receive 20 million shares of FF, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.  The Employment Agreement requires that if Mr. Liu elects to receive the 20 million shares in the form of options, any unvested options must be vested immediately upon Mr. Liu's

termination.

98.     As discussed above, the September 2018 Resolutions granted Mr. Liu options to purchase 20 million shares of Smart King stock, which were subject to a multi-year vesting schedule and remained entirely unvested as of the date of Mr. Liu's termination.  Smart King and Faraday failed to fully and immediately vest Mr. Liu's 20 million options upon his termination as required by the Employment Agreement.

99.     In October 2019, Mr. Jia filed for bankruptcy protection in the United States, listing personal debts of over $3 billion.  Due to the automatic stay, Mr. Liu is presently unable to assert causes of action directly against Mr. Jia individually, notwithstanding Mr. Jia's egregious misconduct as detailed herein.

**Defendants' Damage to Mr. Liu**

100.     Defendants, at Mr. Jia's behest, have inflicted massive damage upon Mr. Liu's career and earnings prospects.

101.     By inducing Mr. Liu to resign from his New York partnership at Mayer Brown, Mr. Liu lost a lucrative equity partnership interest at a global law firm.  He also lost the opportunity to become a retired partner at Mayer Brown, which carries significant economic benefits.

102.     Further, Mr. Liu was induced to abandon extensive client relationships, which he transitioned to colleagues.  Since being terminated by Faraday, Mr. Liu has not been offered any positions at any major law firms because he is perceived to have lost many of these client relationships.

103.     Significantly, Mr. Jia's outrageous mistreatment of Mr. Liu is part of a pattern of fraud, trickery, and dishonesty by Mr. Jia that is now being exposed by authorities in the United States and the PRC.

104.    Thus, for example, on December 17, 2019, the office of the United States Trustee filed a motion in Mr. Jia's bankruptcy case, seeking the appointment of a Chapter 11 trustee.  The U.S. trustee stated that an independent trustee "is required to take control of the estate of Yueting Jia . . . an individual chapter 11 petitioner who has failed to uphold his fiduciary duty to the estate by engaging in dishonest behavior, pre and post-petition."

105.    Further, on December 31, 2019, the Shenzhen Stock Exchange announced disciplinary sanctions against Mr. Jia arising from his violations of PRC securities law, including a *lifetime ban* on Mr. Jia serving as a board member or senior officer of any public company.

106.    Additionally, Mr. Jia has repeatedly been designated by PRC courts at various levels as well as by PRC securities and other regulatory bodies as a "Dishonest Person Subject to Legal Enforcement."

107.    Mr. Jia is now a fugitive from justice, having refused to return to the PRC despite repeated requests from PRC authorities for him to return to the PRC to cooperate with legal investigations of securities fraud and other violations.

108.    At the time he agreed to join Faraday, Mr. Liu had no knowledge that Mr. Jia and his companies were engaged in securities fraud, deceptive practices, or other misconduct.  Now, as a result of the fraudulent and malicious actions taken by Mr. Jia and the Defendants that he controls, Mr. Liu's career and future earnings prospects lie in tatters.

## CLAIMS FOR RELIEF
## COUNT ONE
### (Breach of Contract)
### (Against Faraday and Smart King)

109.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

21

110.    Plaintiff, Faraday, and Smart King are parties to the Employment Agreement, which is a valid, binding and enforceable contract.

111.    Plaintiff has fully complied with all terms of the Employment Agreement.

112.    The Employment Agreement requires that in the event of an early termination of Mr. Liu during his guaranteed five year term, he would receive all unpaid installments on his $3 million signing bonus in a lump sum.  Faraday and Smart King breached the Employment Agreement by failing to pay Mr. Liu the unpaid portion of the $3 million signing bonus, which is $2,400,000.

113.    The Employment Agreement further requires Faraday and Smart King to pay Mr. Liu a minimum base salary of $5 million over the first five years of his employment, and also requires that if Mr. Liu is terminated "for any reason" during that five year period he must be paid any unpaid portion of the $5 million in a lump sum.  Faraday and Smart King breached the agreement by failing to pay the unpaid portion of the $5 million in base salary, which totals approximately $4 million.

114.    Further, under the Employment Agreement, Mr. Liu is entitled to receive 20 million shares of Smart King (representing 2% of the total equity of Smart King), with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.  The Employment Agreement requires that if Mr. Liu elects to receive the 20 million shares in the form of options, any unvested options must be vested immediately upon Mr. Liu's termination.   In or about September 2018, Mr. Liu was granted options to purchase 20,000,000 shares of Smart King stock, which were subject to a multi-year vesting schedule and remained entirely unvested as of the date of Mr. Liu's termination.  Smart King and Faraday failed to fully and immediately vest Mr. Liu's 20 million options upon his termination as required by the Employment Agreement.

22

115.    Plaintiff is entitled to specific performance of his right to immediate vesting of his 20 million Smart King options.

116.    Plaintiff has suffered monetary damages proximately caused by the foregoing breaches in an amount to be proved at trial.

## COUNT TWO

### (Violation of Section 10(b) of The Exchange Act and Rule 10b-5)
### (Against All Defendants)

117.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

118.    Defendants falsely represented that in November 2017, Evergrande had invested $2 billion in Smart King in a Series A offering that valued Smart King at $4.5 billion.  Defendants made these false representations in connection with an offer to Mr. Liu of securities in Smart King, knowing that Mr. Liu would rely on it.

119.    Defendants knew that Smart King had only received $300 million in November 2017 from Evergrande, not $2 billion.  Defendants intentionally concealed the truth, refusing to allow Mr. Liu to examine the Series A documents and to inquire into the details of the transaction.

120.    Defendants' misrepresentations were made in connection with an offer and sale of securities to Mr. Liu.  By accepting an offer of employment in exchange for receiving securities, Mr. Liu effectively purchased securities.  That is, Mr. Liu exchanged something of value — the income stream and retirement benefits from his Mayer Brown partnership — for stock and/or options in Smart King.

121.    Through the foregoing conduct and as more fully described herein, Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly: (a) employed devices,

schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

122.     By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.§ 240.10b-5.

123.     Mr. Liu has been damaged by the foregoing misconduct.

## COUNT THREE
### (Fraudulent Inducement)
### (Against All Defendants)

124.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

125.     In or about January 2018, Defendants falsely represented that in November 2017, Evergrande had invested $2 billion in Smart King in a Series A offering that valued Smart King at $4.5 billion.  Defendants also falsely represented that Mr. Liu would be entitled to directors and officers' insurance while working at Faraday.

126.     As Defendants knew, these representations were false and misleading.  Smart King never received $2 billion from Evergrande.  Smart King and Faraday did not maintain directors and officers' insurance.

127.     Defendants knew and intended Mr. Liu to rely upon their false representations.  In reliance on these false representations, Plaintiff was induced to sign the Employment Agreement, resigned from his lucrative equity partnership with Mayor Brown in New York and began working for Faraday in California.

128.     At the time the representations were made to Plaintiff, he believed them to be true.

24

Plaintiff would not have signed the Employment Agreement and accepted employment with Faraday, but for Defendants' false representations.

129.    By reason of Defendants' misrepresentations and as a result of those misrepresentations, Plaintiff suffered damages in an amount to be proven at trial, including lost income and retirement benefits that Plaintiff would have earned at Mayer Brown absent Defendants' fraud.

130.    The aforementioned conduct of Defendants was an intentional misrepresentation, deceit, or concealment of a material fact known to the Defendants, and was made with the intention on the part of the Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

**COUNT FOUR**

**(Wrongful Termination in Violation of Public Policy)**

**(Against Faraday and Smart King)**

131.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

132.    During his employment, Plaintiff reported serious compliance issues and violations of law, including potential violations of immigration law, failures to adequately investigate sexual harassment complaints, illegal retaliation against employees, breach of employees' privacy, irregular financial activities and timely compliance with the labor law including the WARN Act.

133.    As a direct result of his whistleblowing, Plaintiff was wrongfully discriminated against by Smart King and Faraday.  Plaintiff's work responsibilities were reduced dramatically, and he was then terminated, all in violation of public policy.   Specifically, Plaintiff was terminated

in retaliation for truthfully expressing his concerns with regard to Faraday's failure to comply with applicable California and federal law.

134.    As a result of the illegal retaliatory actions of Smart King and Faraday, Plaintiff suffered humiliation, serious mental anguish, emotional and physical distress, and loss of past and future earnings and employment benefits and opportunities.

135.    As more fully set forth herein, the illegal retaliatory actions of Smart King and Faraday were willful, wanton, malicious, and oppressive and were done with the intent to cause Plaintiff the injury described herein and justify the awarding of exemplary or punitive damages in an amount to be determined at trial.

## COUNT FIVE
### (Intentional Infliction of Emotional Distress)
### (Against All Defendants)

136.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

137.    The conduct of Defendants complained of herein was intentional, malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional and physical distress.  Such conduct was orchestrated with the knowledge that Plaintiff's emotional and physical distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to Plaintiff.

138.    Through such conduct, Defendants intentionally inflicted emotional distress on Plaintiff, proximately causing severe harms to Plaintiff including humiliation, mental anguish, as well as physical injury.

139.    As a result of said distress and consequent harm, Plaintiff has suffered such damages in an amount to be determined at trial.

140.    Further, Defendants acted fraudulently, maliciously, oppressively and with reckless disregard of Plaintiff's rights, health, emotional and physical well-being and safety, and thereby entitling Plaintiff to an award of punitive damages.

## COUNT SIX
### (Negligent Misrepresentation)
### (Against All Defendants)

141.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

142.    As described herein, Defendants made false statements and misrepresentations, which Defendants should have known were false, to Mr. Liu.

143.    Defendants knew and intended that Mr. Liu would rely upon such false statements and misrepresentations in considering whether to accept Faraday's employment offer.

144.    Defendants had a duty, as a result of their special relationship with Mr. Liu, to give correct information.

145.    Mr. Liu reasonably and justifiably relied on the misrepresentations to his detriment.

146.    As a direct and proximate result of Defendants negligent misrepresentations and omissions, Mr. Liu has been damaged.

## COUNT SEVEN
### (Declaratory Judgment)
### (Against Faraday and Smart King)

147.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

148.    Based on the terms of the Employment Agreement, upon termination, Mr. Liu was owed $2,400,000 in unpaid installments of his $3,000,000 signing bonus, as well as $4,000,000 of his $5,000,000 base salary.

149.    Further, under the Employment Agreement, Mr. Liu is entitled to receive 20 million shares of FF, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options.  The Employment Agreement requires that if Mr. Liu elects to receive the 20 million shares in the form of options, any unvested options must be vested immediately upon Mr. Liu's termination.   In or about September 2018, Mr. Liu was granted options to purchase 20,000,000 shares of Smart King stock, which were subject to a multi-year vesting schedule and remained entirely unvested as of the date of Mr. Liu's termination.  Smart King and Faraday failed to fully and immediately vest Mr. Liu's 20 million options upon his termination as required by the Employment Agreement.

150.    Upon Mr. Liu's termination, Faraday and Smart King have refused to recognize or acknowledge Mr. Liu's right to $6,400,000 in unpaid salary and bonus compensation and failed to vest Mr. Liu's 20 million Smart King options.   Accordingly, a justiciable controversy exists, which is sufficiently definite and concrete to warrant declaratory judgment.

151.    Accordingly, Mr. Liu seeks a declaratory judgment that under the terms of the Employment Agreement, he is owed $6,400,000 in unpaid salary and bonus compensation and that his 20 million Smart King options must be vested immediately.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

(1) An award of damages against Smart King and Faraday for breaches of the Employment Agreement;

(2) An order requiring Smart King and Faraday to immediately vest Plaintiff's options to purchase 20 million shares of Smart King, as required by the Employment Agreement;

(3) An award of damages against all Defendants based upon their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

(4) An award of damages against all Defendants based upon their fraudulently inducing Plaintiff to leave his lucrative partnership in New York and work for Faraday in California;

(5) An award of damages against Smart King and Faraday, based upon their wrongful termination of Plaintiff in violation of applicable California public policy;

(6) An award of damages against all Defendants, based upon their intentional infliction of emotional distress upon Plaintiff;

(7) An award of damages against all Defendants, based upon their negligent misrepresentations to Plaintiff;

(8) A declaratory judgment against Faraday and Smart King that Mr. Liu is entitled to $6,400,000 in unpaid salary and bonus compensation and that Mr. Liu is entitled to the immediate vesting of 20,000,000 Smart King options;

(9) An award of punitive damages against all Defendants, based upon their intentional and malicious conduct;

(10) An award of prejudgment interest, attorneys' fees, and costs in favor of Plaintiff; and

(11) Any such further and other relief that the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 3, 2020
New York, New York

SEIDEN LAW GROUP LLP

By:   /s/ Amiad Kushner
Amiad Kushner
469 Seventh Avenue, Fifth Fl.
New York, NY 10018
akushner@seidenlegal.com
(212) 523-0686

*Counsel for Hong Liu*